IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA,

v.

SEAN MOUZON,

*Defendant.*

Criminal Action No. ELH-16-0299

## MEMORANDUM OPINION

Defendant Sean Mouzon, who is self-represented, moved for compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i), based on the risk posed to him by COVID-19.  ECF 69.[1]  He also filed a supplement to his motion.  ECF 73.  I shall refer to ECF 69 and ECF 73 collectively as the "Motion."   The Office of the Federal Public Defender (the "FPD") has advised that it does not intend to supplement the Motion.   ECF 77.   However, the FPD provided the Court with documentation concerning defendant's exhaustion of his administrative remedies.  *See* ECF 77-1.

The government opposes the Motion (ECF 81, the "Opposition"), supported by two exhibits.  *See* ECF 81-2; ECF 81-3.  It urges the Court to deny the Motion for failure to exhaust. ECF 81 at 6.  Moreover, it claims that a review of defendant's medical records reveals that defendant does not suffer from any underlying conditions that might render him particularly vulnerable to COVID-19.  *Id.* at 7-8; *see* ECF 81-2 (medical records). Additionally, the government notes that Mouzon has refused the COVID-19 vaccine. ECF 81 at 8-15.  Thus, in the

---

[1] In ECF 69, defendant indicates that he also filed a post-conviction petition, seeking relief under *Rehaif v. United States*, ___U.S.___, 139 S. Ct. 2191 (2019).  *See* ECF 68 (the "Petition"). The Petition was submitted with the assistance of counsel. *See id.*  But, defendant has since moved to dismiss the Petition (ECF 78), which I granted by Order of September 17, 2021.  ECF 79.

government's view, defendant's case does not exhibit an extraordinary and compelling reason for his release. *Id.* In the alternative, the government maintains that the sentencing factors outlined in 18 U.S.C. § 3553(a) caution against defendant's release. *Id.* at 15-16.

Additionally, the government has submitted an "update to supplement the Government's Response . . . ." ECF 83 (the "Supplement"). In the Supplement, the government acknowledges that Mouzon previously filed two requests for compassionate release in July 2020, which were both rejected. *Id.* But, in its view, these requests do not change its position set forth in the Opposition with respect to exhaustion, because the requests were not directed to the Warden of the facility wherein defendant is currently incarcerated. *Id.*

Defendant has not replied either to the Opposition or to the Supplement. And, the time to do so has expired.

No hearing is necessary. For the reasons that follow, I shall deny the Motion, without prejudice.

## I.    Procedural and Factual Background

On June 15, 2016, a federal grand jury returned a three-count Indictment against Mouzon. ECF 1. He was charged with unlawful possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1) (Count One); possession with intent to distribute a quantity of a mixture or substance containing a detectable amount of cocaine as well as a mixture or substance containing a detectable amount of heroin, in violation of 21 U.S.C. § 841(a)(1) (Count Two); and unlawful possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924 (c)(1)(A) (Count Three).

On December 20, 2016, pursuant to a Plea Agreement (ECF 27), the defendant entered a plea of guilty to Count One of the Indictment. *See* ECF 26.

The Plea Agreement contained a Stipulation of Facts.  ECF 27, ⁋ 6.   It stated that on April 24, 2016, defendant "possessed a firearm, specifically a loaded CN Romarm SA/Cugir rifle, model GP WASR-1063 . . ., which is an AK-47 style rifle, and ammunition . . . ."  *Id.*   On that date, "a Baltimore Police Department detective observed the Defendant walking with a stiff gait, a characteristic the detective knew was common to a person attempting to conceal a firearm in his pants, towards a home in the Cherry Hill community of Baltimore, Maryland."  *Id.* Further, the detective "observed what was immediately apparent to him as a firearm magazine protruding from the Defendant's right pants pocket."  *Id.*

When the detective attempted to stop the defendant, he fled.  *Id.*  Notably, "[t]he detective observed the Defendant reach into his front waistband area and remove the rifle from his pants as he ran."  *Id.*  "Eventually, the Defendant was apprehended[,]" and the "Detective recovered the rifle, which was loaded with one live round in the chamber, and the magazine from the Defendant's pants pocket, which contained sixteen live rounds of ammo and was designed for use with the recovered firearm."  *Id.*

According to the Stipulation of Facts, Mouzon admitted that he "knowingly possessed the firearm and ammunition described above . . . and admits that prior to April 24, 2016, he had been convicted of a crime punishable by imprisonment exceeding one year and his civil rights had not been restored."  *Id.*

Sentencing was held on March 1, 2019. ECF 60.   According to the Presentence Investigation Report ("PSR", ECF 51), Mouzon was 33 years old at that time.  *Id.* at 2.  He had neither a high school diploma nor a GED.  *Id.*  The PSR also specified that defendant had been detained in State custody from April 24, 2016 to December 20, 2016, the date on which he tendered his guilty plea.  *Id.* at 1; *see* ECF 26.

The PSR indicated that, after three deductions under § 3E1.1 of the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G."), Mouzon had an offense level of 30. ECF 51, ¶¶ 22, 25. Moreover, the PSR provided that defendant had a criminal history score of 14 points. This established a Criminal History Category of VI. *Id.* ¶ 35; *see id.* ¶¶ 28-32; *see also* ECF 27, ¶ 9. Accordingly, the Guidelines contemplated a term of imprisonment between 168 months and 210 months. ECF 51, ¶ 58.

Notably, in 2002, at age 16, defendant was charged in the Circuit Court for Baltimore City with a handgun offense. *Id.* ¶ 28. He was convicted of that offense in 2003, and received a sentence of three years, with almost all of it suspended. *Id.* But, he subsequently violated his probation, and the sentence was imposed. *Id.*

On March 2, 2006, defendant was sentenced in the Circuit Court for Baltimore City to a term of nine years' imprisonment for possession with intent to distribute cocaine. *Id.* ¶ 29. The offense occurred in December 2004. *Id.* And, in 2008, he was convicted in the Circuit Court for Baltimore City of another handgun offense, dating to 2004, for which he received a sentence of eight years of imprisonment. *Id.* ¶ 30.

Thereafter, on March 5, 2014, in the Circuit Court for Baltimore City, defendant was sentenced to 18 months' imprisonment for possession with intent to distribute heroin and possession with intent to distribute cocaine. *Id.* ¶ 31. The offenses occurred in 2012. *Id.* Additionally, in December 2015, Mouzon was charged in the Circuit Court for Baltimore City with possession with intent to distribute. *Id.* ¶ 32. He was convicted on April 8, 2016, and sentenced to seven years' custody, nearly all of which was suspended, and a four-year term of probation. *Id.* Defendant was serving his term of probation when the underlying offense occurred. *Id.* ¶¶ 32, 34.

4

The Court sentenced defendant to a below Guidelines sentence of 102 months of imprisonment.  ECF 63 (Judgment) at 2; ECF 64 (Statement of Reasons) at 1.  Further, Mouzon was given credit for time served as of April 24, 2016.  Moreover, the Judgment specified that defendant's federal sentence was to run concurrent with any State sentence.  ECF 63 at 2.  The Court also imposed a four-year term of supervised release.  *Id.* at 3.

According to documents submitted by the FPD, on June 8, 2020, Mouzon submitted a request for compassionate release to the Warden of FCI Schuykill, the facility where he was then incarcerated.  ECF 77-1 at 1.  It was denied approximately three weeks later, on July 1, 2020.  *Id.* at 2.  Moreover, according to the government, on July 13, 2020, and July 23, 2020, defendant filed two additional requests for compassionate release, also directed to the Warden of FCI Schuykill, both of which were rejected.  ECF 83.[2]  This Motion followed on December 22, 2020.  ECF 69.  The government's opposition was filed on September 23, 2021.  ECF 81.[3]

Mouzon is no longer incarcerated at FCI Schuykill.  He is now serving his sentence in Beaumont USP in Texas.  *Id.* at 5-6; *see Inmate Locator*, https://www.bop.gov/inmateloc/ (last accessed Apr. 28, 2022). The record does not reflect the date on which Mouzon was transferred from FCI Schuykill to USP Beaumont.  But, it appears that this transfer was effectuated *before* defendant filed the Motion.  *See* ECF 69-1 (envelope that enclosed ECF 69, reflecting return address at Beaumont USP).  And, there is no indication that defendant submitted a new request for compassionate release to the Warden at USP Beaumont.

---

[2] The government has not provided the Court with a copy of either request, or the Warden's responses thereto.

[3] The Court has been flooded with  motions for compassionate release due to COVID-19.

According to the Bureau of Prisons ("BOP"), the defendant has a projected release date of October 12, 2023.  *See Inmate Locator*, https://www.bop.gov/inmateloc/ (last accessed Apr. 28, 2022).  To date, he has served approximately 70.5% of his sentence.

## II.  Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Hargrove*, 30 F.4th 189, 194 (4th Cir. 2022); *United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson,* 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019).  But, "the rule of finality is subject to a few narrow exceptions."  *Freeman v. United States*, 564 U.S. 522, 526 (2011).  One such exception is when the modification is "expressly permitted by statute."  18 U.S.C.   § 3582(c)(1)(B);   *see   Jackson*,   952   F.3d   at   495.

Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence, if "extraordinary and compelling reasons warrant such a reduction."  18 U.S.C. § 3582(c)(1)(A)(i); *see Hargrove*, 30 F.4th at 194. This provision is an exception to the ordinary rule of finality.  *United States v. Jenkins*, 22 F.4th 162, 169 (4th Cir. 2021).

Section 3582 was enacted as part of the Sentencing Reform Act of 1984.  Originally, it permitted a court to alter a sentence only upon a motion by the Director of the BOP.  *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984).  Thus, a defendant seeking compassionate release had to rely on the BOP Director for relief.  *See*, *e.g*., *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying  compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

For many years, the safety valve of § 3582 languished.  The BOP rarely filed motions on an inmate's behalf.  As a result, compassionate release was exceedingly rare.  *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In December 2018, Congress passed the First Step Act of 2018 ("2018 FSA" or "First Step Act"), Pub. L. 115-391, 132 Stat. 5239 (2018); *see United States v. McCoy*, 981 F.3d 271, 275-76 (4th Cir. 2020).  As amended by the 2018 FSA, 18 U.S.C. § 3582(c)(1)(A) now permits a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], *or upon motion of the defendant after the defendant has fully exhausted all administrative rights* to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first.  (Emphasis added).  So, once a defendant has exhausted his administrative remedies, or after 30 days have passed from the date on which the warden has received the defendant's request, he or she may petition a court directly for compassionate release.  *Jenkins*, 22 F.4th at 169; *United States v. Muhammad*, 16 F.4th 126, 129 (4th Cir. 2021); *McCoy*, 981 F.3d at 276.  That option constitutes a sea change in the law.

Under § 3582(c)(1)(A), the court may modify the defendant's sentence if, "after considering the factors set forth in section 3553(a) [of 18 U.S.C.] to the extent that they are applicable," it finds that

(i) extraordinary and compelling reasons warrant such a reduction; or

(ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the

safety of any other person or the community, as provided under section 3142(g);

and that such a reduction is consistent with applicable policy statements issued by
the Sentencing Commission . . . .

*See United States v. Kibble*, 992 F.3d 326, 330 (4th Cir. 2021) (per curiam); *see also Hargrove*,
30 F.4th at 194; *United States v. High*, 997 F.3d 181, 186 (4th Cir. 2021).

Accordingly, in order to be entitled to relief under 18 U.S.C. § 3582(c)(1)(A)(i), the
defendant must demonstrate that (1) "extraordinary and compelling reasons" warrant a reduction
of his sentence; (2) the factors set forth in 18 U.S.C. § 3553(a) countenance a reduction; and (3)
the sentence modification is "consistent" with applicable policy statements issued by the
Sentencing Commission.  Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the
'extraordinary and compelling reasons' that might merit compassionate release." *McCoy*, 981 F.3d
at 276.  Moreover, "the district court enjoys broad discretion in conducting a § 3582(c)(1)(A)
analysis." *Jenkins*, 22 F.4th at 169.

The Fourth Circuit has said that, "[w]hen deciding whether to reduce a defendant's
sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with
applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820
F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)).  In U.S.S.G. §
1B1.13, titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy
Statement," the Sentencing Commission addressed the "extraordinary and compelling reasons"
that might merit compassionate release. *See McCoy*, 981 F.3d at 276-77.[4]

In particular, U.S.S.G. § 1B1.13 provides that, on motion by the Director of the BOP, the

---

[4] The Sentencing Commission acted pursuant to 28 U.S.C. § 994(t) (directing Sentencing
Commission to "describe what should be extraordinary and compelling reasons for sentence
reduction"), as well as 28 U.S.C. § 994(a)(2)(C).  *See McCoy,* 981 F.3d at 276.

court may reduce a sentence where warranted by extraordinary or compelling reasons (§ 1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§ 1B1.13(1)(B)); the defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 are expansive, and indicate that compassionate release may be based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons." U.S.S.G. § 1B1.13 App. Notes 1(A)-(D). Application Note 1(D), titled "**Other Reasons**," permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 App. Note 1(D). This is the "so-called, 'catch-all' category." *McCoy*, 981 F.3d at 276.

However, as the *McCoy* Court recognized, the policy statement in U.S.S.G. § 1B1.13 was issued in 2006 and was last updated in November 2018, *prior* to the enactment of the First Step Act. *McCoy*, 981 F.3d at 276. Of significance here, it is only "directed at BOP requests for sentence reductions." *Id.* (citing U.S.S.G. § 1B1.13). "By its plain terms, in short, § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)." *McCoy*, 981 F.3d at 282; *see also Jenkins*, 22 F.4th at 169; *United States v. Zullo,* 976 F.3d 228, 230 (2nd Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1100-02 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020). In other words, the policy statement does not apply to the court.

Indeed, "[a]s of now, there is no Sentencing Commission policy statement 'applicable' to [] defendants' compassionate-release motions, which means that district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to § 1B1.13 in determining whether there exist

'extraordinary and compelling reasons' for a sentence reduction." *McCoy*, 981 F.3d at 283; *see also Hargrove*, 30 F.4th at 194-95.  Consequently, district courts are "'empowered…to consider any extraordinary and compelling reason for release that a defendant might raise.'" *McCoy*, 981 F.3d at 284 (quoting *Zullo*, 976 F.3d at 230); *see also Jenkins*, 22 F.4th at 170.

"The factors applicable to the determination of what circumstances can constitute an extraordinary and compelling reason for release from prison are complex and not easily summarized." *Hargrove*, 30 F.4th at 197.  But, "rehabilitation alone cannot serve as a basis for compassionate release." *United States v. Davis*, No. 21-6960, 2022 WL 127900, at * 1 (4th Cir. Jan. 13, 2022) (per curiam); *see McCoy*, 981 F.3d at 286 n.9; *United States v. Harris*, No. 21-6781, 2022 WL 636627, at *1 (4th Cir. Mar. 4, 2022) (per curiam); 28 U.S.C. § 994(t).  However, "successful rehabilitation efforts can be considered" in regard to the analysis of extraordinary and compelling reasons.  *Harris*, 2022 WL 636627, at *1.

The Guidelines "are not directly applicable to defendant-filed motions" under § 3582(c). *Jenkins*, 22 F.4th at 169.  However, "the court may consider these guidelines in defining what should be considered an 'extraordinary and compelling circumstance' warranting a sentence reduction." *Id.* (citing U.S.S.G. § 1B1.13); *see High*, 997 F.3d at 187.  Although there are currently no applicable policy statements for the Sentencing Commission that are applicable to compassionate release, U.S.S.G. § 1B1.13 "remains helpful guidance . . . ."  *McCoy*, 981 F.3d at 282 n.7; *see Hargrove*, 30 F.4th at 194.

As the movant, the defendant bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582.  *See*, *e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, NKM-17-00003, 2020 WL 1650406, at *3 (W.D. Va. Apr. 2, 2020).  And, even if the defendant establishes an extraordinary and compelling reason

that renders him eligible for a sentence reduction, the court must consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate. *See Dillon v. United States*, 560 U.S. 817, 826-27 (2010); *Hargrove*, 30 F.4th at 195; *High*, 997 F.3d at 186; *see also United States v. Butts*, No. 21-6380, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam) (noting that, even if the district court finds extraordinary and compelling circumstances, it must consider the § 3553(a) factors to the extent applicable in exercising its discretion); *Kibble*, 992 F.3d at 329-30 (noting that district court must consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United States v. Trotman*, 829 F. App'x 607, 608 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under § 3582(c)(1)(A), the court must consider the sentencing factors under § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020) (district court must give due consideration to the § 3553(a) factors); *United States v. Spriggs*, CCB-10-0364, 2021 WL 1856667, at *3 (D. Md. May 10, 2021) (court must consider the § 3553(a) factors).

As mentioned, the district court is "'empowered . . . to consider *any* extraordinary and compelling reason for release'" raised by a defendant. *McCoy*, 981 F.3d at 284 (citation omitted); *see Jenkins*, 22 F.4th at 169. Nevertheless, compassionate release is a "rare" remedy. *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019); *see Chambliss*, 948 F.3d at 693-94; *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16, 2020).

To be sure, "[a] district court need not provide an exhaustive explanation analyzing every § 3553(a) factor," nor is it "required to address each of a defendant's arguments when it considers a motion for compassionate release." *Jenkins*, 22 F.4th at 170; *see Chavez-Mena v. United States*,

___ U.S. ___, 138 S. Ct. 1959 (2018) (passim); *High*, 997 F.3d at 187.  But, a district court abuses its discretion when it "act[s] arbitrarily or irrationally," "fail[s] to consider judicially recognized factors constraining its exercise of discretion," "relie[s] on erroneous factual or legal premises," or "commit[s] an error of law."  *High*, 997 F.3d at 187 (internal quotation marks omitted)

### III.    COVID-19

The World Health Organization declared COVID-19 a global pandemic on March 11, 2020.  *See Seth v. McDonough*, 461 F. Supp. 3d 242, 247 (D. Md. 2020).[5]  COVID-19 spawned "a public health crisis more severe than any seen for a hundred years."  *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020).

The judges of this Court "have written extensively about the pandemic."  *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases). Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of it.  *Id.*

That said, the Court must reiterate that the COVID-19 pandemic has been described as the worst public health crisis that the world has experienced since 1918.  *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration.").  Indeed, the pandemic "produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it."  *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *vacated on other grounds*, 815 F. App'x 978 (6th Cir. 2020). For a significant period of time, life as we have known it came to a halt.  For quite some time, businesses and

---

[5] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19.  *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW  (last accessed June 15, 2020).

schools were shuttered or operated on a limited basis, in an effort to thwart the spread of the virus, which is highly contagious. *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (Apr. 2, 2020), https://bit.ly/2XoiDDh. The judiciary, too, faced many operational challenges.

People who are stricken with the virus sometimes experience only mild or moderate symptoms. But, the virus can cause severe medical problems as well as death, especially for those in "high-risk categories . . . ." *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted).

Of relevance here, the Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that may increase the chance of severe illness due to the coronavirus. The risk factors initially identified by the CDC included age (over 65); lung disease; asthma; chronic kidney disease; serious heart disease; obesity; diabetes; liver disease; and a compromised immune system. *See Coronavirus Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16. But, the CDC has repeatedly revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19. In February 2022, it updated its guidance to reflect the most available data. *See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (Feb. 25, 2022), https://bit.ly/38S4NfY.

According to the CDC, the factors that increase the risk include cancer; chronic kidney disease; chronic liver disease; chronic lung diseases, including COPD, asthma (moderate to severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension; dementia or other neurological conditions; diabetes (Type 1 and Type 2); disabilities, such as Down syndrome; heart conditions, such as heart failure, coronary artery disease, cardiomyopathies, and hypertension; HIV; being immunocompromised; liver disease; obesity, where the body mass index ("BMI") is

25 or higher; pregnancy; sickle cell disease; smoking; solid organ or blood stem cell transplant; stroke or cerebrovascular disease; mental health conditions; substance use disorders; and tuberculosis. *Id.*

The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk. *See Older Adults At Greater Risk of Requiring Hospitalization or Dying if Diagnosed with COVID-19*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 27, 2020), https://bit.ly/3g1USZ1. Furthermore, "[t]he risk of severe COVID-19 increases as the number of underlying medical conditions increases in a person." *People with Certain Medical Conditions*, *supra*.

As to the CDC's risk factors, in the context of a motion for compassionate release, the Fourth Circuit has said that "use of a bright-line rule that accepts only the CDC's highest risk conditions is too restrictive." *Hargrove*, 30 F.4th at 195. In other words, there is no bright-line rule predicated only on the CDC's identification of certain health conditions in the "highest risk category." *Id.* at 196.

Particularly at the outset of the pandemic, in an effort to stem the spread of the virus, people were urged to practice "social distancing" and to wear masks. *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3dPA8Ba (last accessed December 9, 2020). However, social distancing is particularly difficult in the penal setting. *Seth*, 2020 WL 2571168, at *2; *Senate Judiciary Hrg. Transcript on Incarceration during COVID-19*, REV.COM (June 2, 2020) (Testimony of BOP Dir. Michael Carvajal at 47:00) ("Prisons by design are not made for social distancing. They are on [sic] the opposite made to contain people in one area."). Indeed, prisoners have little ability to isolate themselves from the threat posed by the coronavirus. *Id.*; *see Cameron*, 2020 WL 2569868,

at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high."). Prisoners usually "share bathrooms, laundry and eating areas," and are often "bunked in the same cell" with several others. Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16, 2020). And, they are not free to follow their own rules.

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance themselves from others. *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We do Not Feel Safe*,' WASH. POST (Aug. 24, 2020) (reporting use of non-reusable masks for months and a lack of transparency around policies for personal protective equipment and testing). They do not get to decide where, when, or how to eat or sleep. Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread. *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 16, 2021) (stating that the "cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting the disease. Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces

within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus. *Seth*, 2020 WL 2571168, at *2. Notably, the BOP implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected. Indeed, as the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3rd Cir. 2020), the BOP has made "extensive and professional efforts to curtail the virus's spread."[6]

The Department of Justice ("DOJ") recognized the unique risks from COVID-19 experienced by inmates and employees of the BOP. The DOJ adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an "extraordinary and compelling reason" warranting a sentence reduction. *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

_____

[6] The *New York Times* reported in June 2020 that cases of COVID-19 "have soared in recent weeks" at jails and prisons across the country. Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020), https://nyti.ms/37JZgH2; *See Cases in Jails and Prisons*, N.Y. TIMES (Oct. 29, 2020) (On October 29, 2020, the *New York Times* reported that, "[i]n American jails and prisons, more than 252,000 people have been infected and at least 1,450 inmates and correctional officers have died" from COVID-19.). On November 21, 2020, the *New York Times* reported that "U.S. correctional facilities are experiencing record spikes in coronavirus infections this fall. During the week of Nov. 17, there were 13,657 new coronavirus infections reported across the state and federal prison systems*." America Is Letting the Coronavirus Rage Through Prisons*, N.Y. TIMES (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

On April 16, 2021, the *New York Times* reported that at least 39% of prisoners are known to have been infected in federal facilities. Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 10, 2021). And, according to the article, the actual count is most likely much higher "because of the dearth of testing." *Id.* Nevertheless, with the passage of time, the outbreaks of COVID-19 have declined.

Former Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, on March 26, 2020, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19.  *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020).  Then, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281.  In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General.  *See* Pub. L. No. 116-136, § 12003(b)(2).  On April 3, 2020, Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ."  *Hallinan*, 2020 WL 3105094, at *9.  Notably, the April 3 memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ."  *Id.*

On May 8, 2020, two BOP officials, Andre Matevousian, then Acting Assistant Director of the Correctional Programs Division, and Hugh Hurwitz, then Assistant Director of the Reentry Services Division, issued a memorandum to implement the Attorney General's directives on the increased use of home confinement.  The memorandum provided that the BOP was prioritizing the review of inmates for home confinement, as to inmates who have either served a certain portion of their sentence or who only have a short amount of time remaining on their sentence.

Although there is currently no cure for the virus, medical treatments have continued to improve.  And, significantly, we have seen the rollout of three vaccines for COVID-19 (Pfizer, Moderna, and Johnson & Johnson).[7]  Initially, the vaccines were made available to health care

---

[7] Questions as to the efficacy of the Johnson & Johnson vaccine were raised as to the Delta and Omicron variants. *See J&J, Sinopharm, Sputnik V COVID-19 shots less effective against Omicron -study*, REUTERS (Dec. 17, 2021), https://www.reuters.com/business/healthcare-pharmaceuticals/jj-sinopharm-sputnik-v-shots-weaker-against-omicron-study-shows-2021-12-17/; Apoorva Mandavilli, *J.&J. Vaccine May Be Less Effective Against Delta, Study Suggests*,

workers, the elderly in nursing homes, and first responders.  But, the criteria for eligibility has since been approved for all persons five years of age and older.  *See* Cheyenne Haslett, *FDA Authorizes COVID-19 Vaccine for Kids 5-11*, ABC NEWS, Oct. 29, 2021, https://abcnews.go.com/Politics/fda-authorizes-covid-19-vaccine-kids-11/story?id=80846188. Approximately 66% of the total U.S. population is fully vaccinated, including 28% of people from ages 5 to 11, 59% of people from ages 12 to 17, 73% of people from ages 18 to 64, and 90% of people age 65 and up.  *See How Vaccinations Are Going in Your County and State*, N.Y. TIMES, https://www.nytimes.com/interactive/2020/us/covid-19-vaccine-doses.html (last visited Apr. 28, 2022).

Moreover, approximately 100.3 million Americans have received a third or "booster" vaccine dose, which the CDC recommends for all persons age 18 and older.  *See id.*; *COVID-19 Vaccine Booster Shots*, CTRS. FOR DISEASE CONTROL, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/booster-shot.html (last updated Apr. 15, 2022).  And, federal regulators have recently approved a second booster dose for individuals age 50 and older.  *See* Cheyenne Haslett and Eric M. Strauss, *Officials say everyone over 50 can get a 4th COVID shot, but 'especially important' for higher risk people*, ABC NEWS (Mar. 29, 2022), https://abcnews.go.com/Health/4th-covid-shot-authorized-fda-50/story?id=83730999.

Given the vaccine rollout, the BOP published "COVID-19 Vaccine Guidance" on January 4, 2021 (version 7.0). *COVID-19 Vaccine Guidance*, Federal Bureau of Prisons Clinical Guidance (Jan. 4, 2021), https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf. Administration of the COVID-19 vaccine (Pfizer and Moderna) will "align with [recommendations of] the Centers

---

N.Y. TIMES (July 20, 2021), https://www.nytimes.com/2021/07/20/health/coronavirus-johnson-vaccine-delta.html.

for Disease Control and Prevention." *Id.* at 4.  Its plan was for prisoners at heightened risk to receive priority for the vaccine. *Id.* at 6.

The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, F*ederal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, FORBES (Dec. 21, 2020), https://www.forbes.com/sites/walterpavlo/2020/12/21/ federal-bureau-of-prisons-starts-vaccination-of-staff-inmates-soon-thereafter/?sh=5683b99aa96f. As of April 28, 2022, the BOP had 137,381 federal inmates and approximately 36,000 staff.  And, by that date, the BOP had administered 348,440 vaccine doses to staff and inmates. *See* https://www.bop.gov/coronavirus/ (last accessed Apr. 28, 2022).

For a brief time in the Fall of 2021, the country enjoyed a reduction of COVID-19 cases. *See* David Leonhardt, *Covid Cases Keep Falling*, N.Y. TIMES, Oct. 27, 2021, https://www.nytimes.com/2021/10/26/briefing/covid-cases-falling-delta.html ("The number of new daily COVID-19 cases has plunged since peaking on Sept.1. Almost as encouraging as the magnitude of the decline is its breadth: Cases have been declining in every region.").  But, the trend was short-lived, due to the spread of the Delta variant and then the Omicron variant.

The Delta variant was thought to be more virulent than were earlier strains of COVID-19. *See Delta Variant: What We Know About the Science*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html (updated Aug. 6, 2021) (noting that the Delta variant is "more than [two times] as contagious as previous variants"); *see also* Jon Kamp & Brianna Abbott, *Delta Variant Recedes Across the United States*, WALL ST. J., Nov. 1, 2021, https://www.wsj.com/articles/delta-surge-of-covid-19-recedes-leaving-winter-challenge-ahead-11635672600 ("The Delta-fueled wave continues to take a serious toll, but the seven day average in reported deaths has dropped to about 1,400 a day from daily

averages above 2,000 in late September, Johns Hopkins data show."); Apoorva Mandavilli, *What to Know About Breakthrough Infections and the Delta Variant*, N.Y. TIMES (Aug. 14, 2021), https://www.nytimes.com/article/covid-breakthrough-delta-variant.html (noting that, as of August 14, 2021, "[i]nfections have spiked to the highest levels in six months").

After the Delta variant, the Omicron variant emerged, both around the world and in the United States.  It sparked further cause for concern, because it was highly contagious.  *See Omicron Variant: What You Need to Know*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html (last updated Dec. 13, 2021).  Indeed, Omicron contributed to a substantial and serious spike in COVID-19 cases.  *See, e.g.*, Aya Elamroussi, *"Omicron surge is 'unlike anything we've ever seen,' expert says,"* CNN (Dec. 31, 2021), https://www.cnn.com/2021/12/30/health/us-coronavirus-thursday/index.html.

Then, the number of COVID-19 cases again declined.  *See, e.g.*, Anabelle Timsit, *U.S. coronavirus cases are dropping. Other countries are breaking records.*, WASH. POST (Feb. 7, 2022),                https://www.washingtonpost.com/nation/2022/02/07/covid-omicron-variant-live-updates/#link-ZMG6VYX45VH5RAD3JX3IN3JF3Y.    And, the country began to return to normalcy.  Nevertheless, we have once again begun to experience an uptick in COVID-19 cases.  *See, e.g.*, Anne Barnard, *Covid Cases Are Rising Again. How Cautious Should We Be?*, N.Y. TIMES (Apr. 7, 2022), https://www.nytimes.com/2022/04/07/nyregion/covid-cases-are-rising-again-how-cautious-should-we-be.html.

As of April 28, 2022, COVID-19 has infected more than 81 million Americans and caused approximately 992,000 deaths in this country.  *See COVID-19 Dashboard*, THE JOHNS HOPKINS UNIV., https://bit.ly/2WD4XU9 (last accessed Apr. 28, 2022).  And, as of the same date, the BOP reported that 54 federal inmates, out of a total population of 137,381, and 148 BOP staff, out of

some 36,000 staff members, currently tested positive for COVID-19.  Moreover, 52,517 inmates and 12,573 staff have recovered from the virus.  In addition, 294 inmates and seven staff members have died from the virus.  The BOP has completed 128,757 COVID-19 tests.  *See* https://www.bop.gov/coronavirus/, *supra*.

With respect to USP Beaumont, where the defendant is imprisoned, the BOP reported that as of April 28, 2022, out of a total of 1,368 inmates, zero inmates or staff have tested positive, zero inmates have died of COVID-19, and 264 inmates and 99 staff have recovered at the facility. In addition, 495 staff members and 3,493 inmates across the USP Beaumont, FCI Beaumont Medium, and FCI Beaumont Low complexes have been inoculated with the vaccine.  *See* https://www.bop.gov/coronavirus/,                  Federal                  Bureau                  of                  Prisons, https://www.bop.gov/locations/institutions/bmp/ (last visited Apr. 28, 2022).

## IV.    Discussion

In the Motion, defendant asks the Court to grant him compassionate release, in light of the danger posed to him by COVID-19.  *See* ECF 69; ECF 73.  The government contends that the Court should deny the Motion because defendant has failed to exhaust his administrative remedies; Mouzon has failed to present the Court with an extraordinary and compelling reason for his release; and a balancing of the sentencing factors outlined in 18 U.S.C. § 3553(a) militate against defendant's release.  *See* ECF 81 at 6-16; *see also* ECF 83.

## A.

As a threshold issue, the government argues that Mouzon has failed to satisfy the exhaustion requirements of the compassionate release statute.  ECF 81 at 6; *see also* ECF 83.  As amended by the FSA, 18 U.S.C. § 3582(c)(1)(A) permits a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], or upon motion of the defendant after the

defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first. So, once a defendant has exhausted his administrative remedies, he may petition a court directly for compassionate release. *See, e.g.*, *Jenkins*, 22 F.4th at 169 ("Congress enacted the First Step Act to allow incarcerated individuals to directly petition district courts for compassionate release so long as they first exhaust their administrative remedies.").

In this case, documentation supplied by the FPD reflects that Mouzon submitted a request for compassionate release to the Warden of FCI Schuykill, the facility where he was then incarcerated, on June 8, 2020. ECF 77-1 at 1. It was denied soon thereafter, on July 1, 2020. *Id.* at 2. Further, the government maintains that Mouzon submitted two additional requests to the Warden of FCI Schuykill in July 2020, which were both rejected. ECF 83.

However, the government maintains that these requests for compassionate release do not satisfy the relevant exhaustion requirements because defendant was transferred to a new facility and did not submit a new request for compassionate release to the Warden of his new facility. ECF 83. Thus, in the government's view, Mouzon has failed to satisfy the exhaustion requirements set forth in 18 U.S.C. § 3582(c)(1)(A).

Notably, the government does not cite to any authority in support of its argument. And, at first glance, it is not clear to me that its assertion is consistent with the text of 18 U.S.C. § 3582(c)(1)(A). Indeed, several other courts have adopted a position at odds with the one outlined by the government. *See*, *e.g.*, *United States v. Hamidu*, 2:18-CR-00058-6, 2021 WL 2808721, at *2 (S.D. Ohio Jul. 6, 2021) (collecting cases).

I shall assume, for present purposes, that despite defendant's transfer to USP Beaumont, defendant's requests for compassionate release, submitted to the warden of FCI Schuykill, while defendant was incarcerated there, are sufficient to satisfy the threshold exhaustion requirements outlined in 18 U.S.C. § 3582(c)(1)(A).

## B.

Turning to the extraordinary and compelling analysis, the Motion is solely predicated on defendant's purported vulnerability to COVID-19. ECF 69; ECF 73. Defendant is now 36 years of age (ECF 51 at 2), and his medical records reflect that he is in relatively good health. *See generally* ECF 81-2.

As to defendant's vulnerability to COVID-19, the government notes (ECF 81 at 8) that Mouzon has failed to identify any underlying medical conditions that would heighten his risk of severe illness were he to contract the virus that causes COVID-19. *See* ECF 69; ECF 73. But, defendant's medical records reflect that he suffers from severe opioid use disorder. *See* ECF 81-2 at 9, 16. These records also indicate that, as of November 2, 2020, defendant had a body mass index ("BMI") in the range of 26.0 and 26.9. *Id.* According to the CDC, the defendant's BMI renders him slightly overweight. *See Certain Medical Conditions*, *supra*.[8]

Also according to the CDC, substance use disorders and being overweight are among the conditions that "can make you more likely to get very sick from COVID-19." *See Certain Medical Conditions, supra*. In addition, the CDC cautions that "[a] person's risk of severe illness from COVID-19 increases as the number of underlying medical conditions they have increases." *Id.*

---

[8] Defendant's weight was not specifically noted on November 2, 2020, the most recent date on which his BMI was recorded. *See* ECF 81-2 at 9, 16. But, at sentencing, defendant was six feet tall and weighed 225 pounds. ECF 51, ¶ 50. And, defendant's medical records reflect that on June 17, 2021, defendant weighed approximately 221 pounds. *See* ECF 81-2 at 5.

Even so, I am persuaded that defendant is not eligible for compassionate release on the basis of his alleged vulnerability to COVID-19 because, at least as of September 23, 2021, he has refused to be inoculated against the virus that causes the disease. *See* ECF 81-2 at 14, 32. Moreover, defendant has not offered any explanation for his refusal.

Judge Gallagher has previously observed: "Courts now widely recognize that a refusal to take preventative measures to protect oneself from COVID-19 undermines any assertion that the risk of viral infection constitutes an extraordinary and compelling reason justifying release. . . . Any decision to the contrary would create a perverse incentive in favor of declining the vaccine, undermining the BOP's efforts to protect its incarcerated population and to allow prison operations to return to some degree of normalcy in the coming months." *United States v. Ayres*, SAG-04-004, 2021 WL 2352322, at *2 (D. Md. June 9, 2021) (collecting cases); *accord United States v. Manon*, Crim. No. 16-00460 (SDW), 2022 WL 408958, at *3 (D.N.J. Feb. 10, 2022); *United States v. Carter*, 3:19-cr-356, 2022 WL 272196, at *2-3 (N.D. Ohio Jan. 28, 2022); *United States v. Culp*, 92-cr-81058, 2021 WL 5834312, at *2 (E.D. Mich. Dec. 9, 2021); *United States v. Hignight*, 4:14-CR-129(4), 2021 WL 5299249, at *6 (E.D. Tex. Nov. 12, 2021) *United States v. Brice*, SAG-07-0261, 2021 WL 1926713, at *3 (D. Md. May 13, 2021); *United States v. Siegel*, TDC-03-0393, 2021 WL 962491, at *2 (D. Md. Mar. 15, 2021).

Defendant's underlying medical conditions are not severe. Moreover, defendant's refusal to be vaccinated against COVID-19 is a factor in assessing any concern regarding defendant's health conditions.

I am of the view that defendant's underlying medical conditions do not constitute an extraordinary and compelling reason for defendant's release under 18 U.S.C. § 3582. However, if

defendant has become fully vaccinated against COVID-19 during the pendency of his Motion, he should promptly inform the Court of the same.

### C.

Even assuming that Mouzon presented an extraordinary and compelling reason for his release, I would deny the Motion because the sentencing factors set forth in 18 U.S.C. § 3553(a) militate against his release at this time. These factors include: (1) the nature of the offense and the defendant's characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the kinds of sentences available and the applicable Guidelines range; (4) any pertinent Commission policy statements; (5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to victims. *See High*, 997 F.3d at 186.

The instant offense is a serious one. Mouzon, a convicted felon, knowingly possessed an AK-47 style rifle while walking around the Cherry Hill neighborhood of Baltimore City. ECF 27, ¶ 6. Moreover, the firearm was loaded with a live round of ammunition. *Id.* And, when Mouzon was approached by a detective employed by the Baltimore Police Department, he attempted to flee and discarded a loaded, dangerous weapon. *Id.* Defendant's conduct put those around him at risk of grave harm.

Mouzon's criminal history is also of great concern to the Court. Defendant has previously served sentences of incarceration. Yet, they were insufficient to deter him from engaging in the criminal behavior that led to his current imprisonment. Indeed, Mouzon committed the instant offense while on probation for a previous felony drug crime. ECF 51, ¶ 34.

To be sure, Mouzon has already served approximately 70.5% of his 102-month sentence. ECF 63 at 2; *see Inmate Locator*, https://www.bop.gov/inmateloc/ (last accessed Apr. 28, 2022).

But, that sentence was quite lenient, and was well below the range contemplated by the Guidelines. ECF 51, ¶ 58. As I see it, defendant's time served to date does not adequately reflect the seriousness of his criminal activity.

Mouzon asserts that he has arranged for post-release employment at "Pace Cars Auto Shop". ECF 73 at 1; *see also* ECF 69 at 1-2. Defendant also states that, upon his release, his family and friends will help him return to society. ECF 69 at 2. In particular, Mouzon notes that his mother and sister will provide him with a place to live in Baltimore and help pay for medical bills that he may incur. *Id.* Further, defendant indicates that he has an eight-year old son who "need[s] [him] in his life and to be their [sic] every step of the way during these very hard times." *Id.* Additionally, Mouzon states that he is "housed at R-DAP programming" and is "bettering [himself]." *Id.* at 1.

The Court is sympathetic to Mouzon's situation and is encouraged that Mouzon has endeavored to rehabilitate himself, and has planned for his life following his release from prison. But, the Fourth Circuit has clarified that "rehabilitation alone cannot serve as a basis for compassionate release." *Davis*, 2022 WL 127900, at * 1. In any event, defendant's assertions regarding his rehabilitation are undermined by his problematic disciplinary record. *See* ECF 81-3.

Notably, in *Pepper v. United States*, 562 U.S. 476, 492 (2011), the Supreme Court acknowledged that a defendant's post-sentencing conduct "provides the most-up-to-date picture of [a defendant's] 'history and characteristics.'" (Quoting 18 U.S.C. § 3553(a)(1)). The government has provided documentation that indicates that, during his incarceration, Mouzon has incurred numerous disciplinary infractions, including for fighting with another person as well as the use of drugs or alcohol. *See* ECF 81-3. Such behavior is worrisome. It suggests that Mouzon

26

has not learned to follow the rules and thus he could pose a danger to the community if he were to be released at this juncture.

### V.    Conclusion

In sum, given the leniency of the original sentence, the seriousness of the offense, defendant's criminal history, and his post-conviction conduct, Mouzon's release is not appropriate at this time.

For all of the aforementioned reasons, I shall deny the Motion, without prejudice to defendant's right to renew the Motion upon his full vaccination for COVID-19 and/or for some other reason.

An Order follows, consistent with this Memorandum Opinion.


Date: April 29, 2022                              _____/s/_____
                                                  Ellen L.  Hollander
                                                  United States District Judge

27